NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————
:
SPRINGBOK FINANCE, LIMITED**,**                  :
:          Civil Action No. 06-3059 (PGS)
Plaintiff,          :
:
v.                                                              :
:                       **OPINION**
RICHARD M. SIMON and                          :
SUSAN SIMON,                                         :
:
Defendants.          :
———————————————————:

### SHERIDAN,  U.S.D.J.

This case comes before the Court on Plaintiff's claims for breach of contract, unjust

enrichment, fraudulent inducement, and quantum meruit, and Defendant's counterclaims for breach

of contract and unjust enrichment.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  A

non-jury trial was held on March 24 and March 25, 2008.  In broad terms, Plaintiff claims it loaned

Defendants $250,000 for a down payment on a single family dwelling in Gillette, New Jersey. It

seeks to recover principle, interest, and a placement fee.  Defendants do not deny the loan was made,

but argue the language of the loan agreement does not require repayment, and that Plaintiff breached

an agreement to pay Defendant $15,000 per month (hereinafter referred to as the "Monthly

Payment"), which must be set off from any amount owed.

Defendant Richard M. Simon ("Simon") began working in the garment industry in August

of 1960.  Simon held a series of positions in the garment business from 1960 to 1969, including

working for Shellburn Shirt Company, McGregor Sports Wear, and Harwood Manufacturing.

Beginning in 1969, Simon formed his own company, Pier Connection, of which he was president. Simon operated Pier Connection from 1969 until 1996. Thereafter he continued working in the area of wholesale importing.

Plaintiff Springbok Finance, Ltd. ("Springbok") is a corporation formed under the laws of the United Kingdom with its principal place of business in England. It provides short term international financing for the manufacture and delivery of goods. Its principal is Tony Slowther ("Slowther").

In the summer of 2004, Slowther and Simon met at a trade industry convention in Las Vegas. Over the next several months, Simon and Slowther worked out a business relationship. These discussions took place in Las Vegas, New York, and London. Simon and Slowther are seasoned and shrewd business persons.

The business relationship operated in the following manner. Simon, through his company, PRC Group, Inc. ("PRC Group"), had relationships with North American companies that required goods which were manufactured abroad. PRC Group would obtain orders for goods from those contacts. In addition, PRC Group would arrange for the manufacture of the goods, as well as shipment and delivery to its customer. Payment was due at the time of acceptance. In order to pay for the costs of manufacturing and delivery, PRC Group required funds. Springbok was in the business of financing such deals. It is a niche financing market which has many inherent risks due to the multi-national aspects of each transaction. According to the parties, Springbok and PRC Group agreed to split the net proceeds from such transactions. It was essentially a joint venture. In other words, as a result of their discussions, both Slowther of Springbok, and Simon of PRC Group, understood that Springbok was to support the relationship by supplying the necessary funds to create

a United States distribution company, and PRC Group would be a wholesale garment importer responsible for marketing, merchandising, and manufacturing.

At the outset (September 2004), with little or no documentation memorializing the relationship, there was a "credit facility" established by Springbok in the amount of $500,000 for transactions generated through PRC Group efforts. It is unclear whether the $500,000 was restricted for certain uses; however, the parties acknowledge that the Monthly Payment was discussed at that time. Simon testified:

> Q: So that you understood that to mean that Springbok would make available $500,000 as indicated on the first page where it says, "credit limit."  Correct?
>
> A: Yes.
>
> Q: Instead of charging a finance charge Springbok would be entitled to 50 percent of the profits on each deal if there were any?
>
> A: Yes.
>
> Q: Is that correct?  That's the arrangement that PRC Grouping, your company, made with Springbok in September of 2004?
>
> A: Yes.
>
> Q: Can you show me where on this document, the Defendant's Exhibit 1, it says you are entitled to receive $15,000 per month?
>
> A: That was done later.
>
> ***
>
> Q: Did you notice that it doesn't say anything about you receiving $15,000?
>
> A: This was not the document in which we both had that agreement. This particular document was merely for Tony to be able to start

3

> doing business with PRC as a trade finance company but it assured
> him that if there was profits he would share in them

(Tr. Trans. 1:62 through 63, 10).  Despite the fact there was no agreement regarding the Monthly Payment in the autumn of 2004, Springbok paid Simon $6,332 (September), $7,960 (October), $14,955 (November), and $22,930 (December).

In December, 2004, the parties discussed their expectations for the business in 2005.  On December 14, 2004, Slowther provided "expense cash flows for the office for next year" on a  chart (Excel spreadsheet) entitled "cash flow/overhead costs" (hereinafter referred to as the "Cash Flow Spreadsheet").  Although the testimony at trial did not thoroughly explain each expense enumerated on the document, the Cash Flow Spreadsheet clearly projected payment of $15,000 per month for the months December, 2004 through September, 2005 to Simon in a column entitled "Sal R.S.".  Obviously "Sal" is an abbreviation of salary, and "R.S." are Richard Simon's initials.

There was continual controversy surrounding the Monthly Payment from the get-go.  On January 4, 2005, Slowther emailed Simon:

> I have tody paid the $17,000 to PRC out of HSBC.  The funds will hit
> tomorrow. As I said in an earlier email the $10,000 paid Friday and
> the $17,000 paid today will cover all the bills which were shown on
> the account plus $15,000 to you less what you drew over the weekend
> (no including Srini).
>
> It took me a lot to do this Richard so I really need to see both the docs
> from Srini and some goods on the water from India.

On January 6, 2005, Simon complained to Slowther regarding non-payment of the Monthly Payment for expenses. He wrote:

> Susan called me and told me that between the two accounts I am now
> overdrawn $9000 December.  The way I see it, when the $10,000 was
> left there was $10,800 left in the account. We have transferred to date
> to Srini in December $13,420. We've paid out of $6,641 leaving a
> minus balance of $9,200 which I realized has come of the __ to
> Richard Simon leaving me short for December $9,000 and in need of
> my $15,000 for January.  Please review your figures and do the best
> you can for me.

Slowther replied to Simon by simply stating that his accounting "does not make sense."  There  is

further evidence that there was tension between Simon and Slowther over the monthly payments.

In February, 2005, Springbok paid Simon $3,975 for expenses or salary.

On or about March 1, 2005, PRC Group and Springbok  established a corporation in England

called PRC International, Ltd. ("Limited")  through which the business relationship between the

companies would  operate.  Simon acknowledges that he was a director of the company. On that

date, Simon received a letter from Limited concerning PRC Group's expenses.  More specifically,

David Sharpin, a director of Limited, wrote to Simon stating that Limited intended to establish a U.S.

marketing office, and that Simon would be paid salary and expenses pursuant to an agreed-upon

procedure (hereinafter "the Sharpin Letter").   Limited committed to the following procedure for

payment of salary and expenses for the office and the Monthly Payment along with a caveat on its

obligation:

> As at month end, you will submit an itemized invoice USD covering
> the actual salary costs of yourself and your two assistants, the actual
> Federal State Employment Taxes applicable to those salaries, the
> actual cost of occupancy of the office, to include property taxes,
> utilities and telephone costs. and your business travel expenses. In the
> event you have any extraordinary expenses any month you will add
> that  to  the  invoice  and  attach  the  necessary  justification
> documentation to the invoice.

The Sharpin Letter conditions the payment of expenses based upon receipt "of proceeds from successfully completed sales." The Sharpin letter reads:

> We shall pay the invoice immediately, subject to receiving sufficient proceeds from successfully completed sales of goods. In the event there are not sufficient funds available immediately, payment will be made as soon as possible thereafter.

Despite the establishment of Limited, it was not actually used as the entity through which this business was transacted. It is acknowledged that Simon received some payments for expenses from Slowther or Springbok; but few, if any, payments came from Limited's bank accounts. More particularly, Simon and his wife had an account with Somerset Hills Bank. On some occasions, Springbok would transfer fund directly to Simon at his Somerset Hills Bank account. (see Somerset Hills Bank "incoming wire transfers"). Simon received payments from an assortment of Switzerland and U.K. banks at the direction of Slowther. As noted above, Simon never received a check from Limited.

In March, 2005, Simon received payment of $9,425 from Springbok. However, in a memo dated March 23, 2005, Slowther indicates that he is forwarding $32,700 for expenses including $10,000 to cover Simon's salary which he is "literally going to have to steal" from his client. This discrepancy was never explained.

In April 2005, Springbok agreed to arrange a loan of $250,000 to the Simons for the purpose of providing a down payment for the purchase of single family residence in Gillette, New Jersey. There are three letters setting forth the terms of the loan. In the first letter, dated April 4, 2005, Simon represented that he would repay the "debt plus interest" upon liquidation of his interest in a

company known as First Dallas Associates, L.P., which was estimated to be worth $600,000. The

second letter, dated April 22, 2005, provides for more collateral.  The letter states:

> Susan and Richard Simon will only use the $250,000 deposit for
> purchase of real estate on contract of 16 Fenview, Gillette, NJ. These
> funds are used as down payment of 25% of total cost. These funds
> will be refunded within one year or the house will be sold or
> refinanced to replace the $250,000. We also pledge Salvador Dali art
> and other oil wood carvings valued at $500,000. These works are free
> of all leans [sic] and pledged.  The $250,000 deposit is to be in my
> lawyers trust account by Friday, April, 22.

Evidently, this April 22, 2005 letter was insufficient, so finally the Simons signed another letter

dated April 25, 2005. The letter reads in full:

> •      that the property known as 16 Fenview, Gillette, New Jersey
> is being bought in [the Simons] joint names and that no other parties
> has or will have an interest in the property including immediate
> family such as [the Simons'] children;
>
> •      that the funds advanced together with the advance from the
> mortgage company total no more than the cost of 16 Fenview Gillette,
> NJ;
>
> •      that [the Simons] cannot sell 16 Fenview, Gillette, NJ without
> prior consent of Springbok Finance Ltd.;
>
> •      that should Springbok Finance Ltd., through the trading of
> PRC International Limited and its purchase and sale of up to 7
> containers of ladies blouses ex. Togo,  fail to recover the advance and
> costs involved, [the Simons] will endeavor to raise an equity loan on
> 16 Fenview equivalent to the amount advanced and costs involved to
> settle such advance and costs;
>
> •      that should [the Simons] fail to raise the equity loan [the
> Simons] will agree to sell Fenview, Gillette, New Jersey within a
> period of one year to settle the advance and costs involved.
>
> •      that as additional security [the Simons] will pledge Salvador
> Dali art and other oil and wood carvings valued at approximately

$500,000. At any time, Springbok has the right to ask Sotheby's to give their valuation of such art work;

• the artwork etc. is free of any liens and pledges.

While this loan was being arranged, the parties continued to snipe at each other over the Monthly Payments.

On May 16, 2005, Simon e-mailed Slowther about his expenses. He penned:

I am ans. this with restraint. This idea that the partnership is one way must stop.  I am working and building each day with very little support.  My expenses and borrowing to keep going are mounting. We are in the business to earn $ and we will. My part is to create sales and production and a presents [sic] here in the USA.  Your job was to finance me. This past month I am existing on fumes. Our agreement of $15,000 per month has died and the office exp has been cut to a min. I have cont to expand this side with add sales and people.  As far africa I have cont to support it to completion  As of today you know the deposit is not in and we should not put this in jeopardy. Lets not threaten ea other as it will only cause our friendship harm. Richard.

In this correspondence, Simon appears to acknowledge that the alleged monthly payment agreement, as of May, "had died," assuming there was one to begin with; furthermore, no payments were made to Simon between May and August of 2005.[1]   Slowther replied that Simon's notion about the $15,000 monthly payment was pure folly.  He replied:

The idea was to finance against profitable deals, deliveries on time and African containers that were imminent. So far none of this has been achieved. There was never any agreement to provide limitless funds and any sane lender would have given up long ago.  Please tell

---

[1]  Even if there was an agreement as to the Monthly Payments, there was no definite term to the payments; at best it could have been viewed as an indefinite, shifting arrangement, and not a static plan put in place with the intent of it lasting a long period of time.

8

> me why something is deserved on an ongoing basis if there has been
> no performance.

The very next day, on May 17, 2005, Slowther transmitted $250,000 to the Simons for the real estate loan which he raised with the assistance of an acquaintance,  Andrew Cummins ("Andrew") from a third party (identified only as "the Russians").  Slowther testified that at that time he orally advised Simon that there would be a placement fee and interest charged on the loan.

 From Simon's viewpoint (and most likely that of his attorney), the loan was a great deal for several reasons.  First, the letters are silent as to the rate of interest and the placement fee charged, if any.  Second, the loan was not secured by a mortgage as would be the usual practice. And lastly, considering the loan letters as a whole, the loan required Simon to pledge his interest in First Dallas Associates, Salvador Dali art, and other artwork, but no financing  statement (UCC No. 1) or other documentation was required. As it turns out, Simon's interest in First Dallas was worthless, and the Salvador Dali artwork was a knock-off.   For all practical purposes, the real estate loan was unsecured.

For the period between April 1 through August 31, 2005, Simon received no payments from Springbok. As of September 28, 2005,  it appears Slowther was required to repay the real estate loan from the "Russians" and/or renegotiate its terms.  He forwarded a letter to Simon's attorney outlining the terms in order to refinance including mention of interest and a placement fee:

> In had initially lent Richard $250,000 to use as the deposit on his and
> Susan's purchase of 16 Fenview Gillette, NJ. Repayment was
> supposed to come from the proceeds of the First Dallas Investment,
> which was being sold in May was to produce funds so I could be
> settled June/July. As you are aware from papers Richard has sent you
> it appears the funds will not be available until January 2006 when
> Richard is given the K-1.

Unfortunately my funding does not allow me to lend on a long term basis on non related trade finance business and I have to replace the funding. I should be able to arrange it but it will need to be on a more secure basis and it is for this I will need your assistance:

1.      Richard will need to assign the proceeds of the First Dallas investment to your firm.

2.      First Dallas needs to acknowledge this assignment to you.

3.      Richard will need to issue you an irrevocable instruction to pay the $250,000 plus interest/commissions to the party who will advance the funds.

4.      The party concerned will need to know from you that points 1, 2 and 3 have been complied with and  that all is legally binding.

I have attached two documents, one signed by Richard where he confirmed that he would not sell the First Dallas bond without Springbok approval and that he would pay the $250,000 from the proceeds and the second by Richard and Susan that is self explanatory.

Although I have faith in Richard the new lenders do not know him and they need something more concrete and legal.

I trust that this is something that can be achieved and presume that you will need Richards approval prior to any action being taken.

Although Simon never acknowledged the letter, he did take steps to direct distribution of his investment in First Dallas Associates, L.P. to Springbok. In a letter to his broker dated October 27, 2005, Simon directed the broker to pay "all future distributions not exceeding $250,000 to Springbok."  Interestingly, Simon does not include payment of interest or a placement fee in his instructions to the broker.  Simon wrote:

Dear Peter:
Currently, all distributions from my interest in First Dallas Associates L.P. are being paid directly to me. Please send all future distributions

10

payable as provided in and sent to the address set forth in the attached schedule.  If you have any questions, please feel free to contact me.

* * *

This letter shall serve as authorization that upon receipt of the funds distributed in the above referenced account from First Dallas Associates, L.P. all future distributions, not exceeding $250,000 shall be paid directly to Springbok Finance Limited located at 3 Manor Farms Barns, Fox Road, Faramingham Pigot, Norfolk, NR 14 7PZ, United Kingdom.
This distribution of funds will be used as satisfaction for the loan from Springbok Finance Limited to me for $250,000. I will not cancel this authorization without the written approval of Springbok Finance Limited.

Up until this time, there were two documents which fleetingly referenced payment of interest and a placement fee; but little, if any, detail was discussed, such as the interest rate or the amount of the placement fee.  There was nothing definite about them.   Simon never affirmatively agreed in writing to the payment of a placement fee or interest on the loan at that time.

Meanwhile, from September 27, 2005, through March 20, 2006, Springbok made substantial payments to Simon in varying amounts as set forth below:

| | |
|---|---|
| September | $7,980 |
| October | $11,980 |
| November | $16,630.00 |
| December | $9,375.00 |
| January, 2006 | $24,955.00 |
| February, 2006 | -0- |
| March, 2006 | $14,980 |

However, the parties acknowledge that the business relationship never really gelled, and had deteriorated over the previous several months. As Slowther testified, it had "completely broken down" by March, 2006, and "in the end the deal just wasn't a profitable deal."  The last straw

11

appears to have occurred in early April 2006, when Slowther expressed his anxiety and frustration with the business arrangement.  At that time, he summed up his viewpoint:

> At the moment I am still trying to borrow funds to cover your house loan.  I stand a good chance of getting a good beating (that is no joke) as I am already late on repayment.  Again, I am taking the shit for you.

In May 2006 Simon made an attempt to refinance the Gillette residence in order to pay the home loan, but this did not materialize as envisioned. Simon eventually refinanced; but there was insufficient proceeds to repay Springbok once Simon paid back taxes.

## I.

Springbok seeks judgment against Simon in the amount of $306,382.61, which includes the principal of $250,000 and $56,382.61 in interest and placement fees.  There is no doubt that Simon entered into a contract with Springbok for the loan of $250,000 which Simon agreed to pay back within one year.  The correspondence in April and May 2005 conclusively prove this arrangement. (See Op. at p. 6-7).   Simon clearly agreed, in writing, to pay back, at the very least, the $250,000 loaned to him by Springbok, and seemingly admitted same through his testimony.   A contract is formed when the basic elements of offer, acceptance, and consideration are present.  *Smith v. SBC Comm'ns, Inc.*, 178 N.J. 265, 283 (2004).  Furthermore, "[t]o constitute a valid agreement there must be a meeting of minds upon every feature and element of such agreement."  *Fire Ins. Ass'n v. Wickham*, 141 U.S. 564, 579 (1891).  The Court finds that Simon basically agreed to repay the

$250,000.  There was clear meeting of the minds as to this agreement and as to the fact that the loan had to be paid back.[2]

The parties do not dispute the repayment was to be accomplished though one of several methods.  That is, Simon had to liquidate his interest in First Dallas Associates, refinance his house, sell his house, or sell his artwork (Tr. Trans. 2:32, 2-5).[3]  Simon excuses his failure to repay by arguing that he satisfied the loan terms by attempting to refinance his home (which he eventually did, but without enough equity to do more than pay his back taxes and prevent foreclosure of his house).  This is a puzzling conclusion.  It is clear that Slowther's intent in drafting the April 25, 2005 letter in a disjunctive fashion was to ensure repayment of a loan through some means.  If the refinancing failed, Simon would have to sell the house or the artwork – whichever would result in payment.  The intent surely was not that if one repayment method failed, repayment was no longer required (or that Simon was no longer obligated to put forth all efforts to return the money).  Slowther testified that

---

[2]  Simon, in his post-trial brief, claims duress, and emphasizes that Slowther drafted the April 25, 2005 letter, the letter was not negotiated, and that Slowther knew that Simon was in dire financial straights.  The Court finds this argument to be without merit.  Simon was the one that requested the loan from Springbok initially, and Slowther was hesitant at the outset.  While the April 25, 2005 letter was drafted by Slowther, previous letters leading up to the agreement appear to be drafted by Simon, which contain many of the same provisions as the April 25, 2005 letter.  Furthermore, Simon is a sophisticated businessman who was in a working, professional relationship with Springbok and knew Slowther personally; there is nothing in the record that indicates any overreaching by Springbok, and because of Simon's business background, there is nothing to indicate that he could not have negotiated the terms of the final agreement had he desired to do so.  Thus, the Court is hard-pressed to find any evidence of duress or that the loan agreement was a "contract of adhesion" as Simon also claims.

[3]  The first option for repayment, as spelled out in the fifth bullet point of the April 25, 2005 letter, is to recoup the advance from the sale of blouses; however, it is clear that this option was unavailable given that the PRC/Springbok joint venture ended up as a failed and profitless business venture.  Thus, Simon's alternatives were clear – refinance the home, sell the home, or sell the artwork to make up for any additional funds needed.

Simon "either had to refinance, sell the house, sell the art work.  It's all in the last letter.  They had to repay the 250,000."  (Tr. Trans. 2:32, 2-5).  Clearly, Slowther's intent was to get paid through some means.[4]   It strains credibility that Simon should be relieved of repayment when the security proffered failed.  The Court holds that Simon breached the agreement by failing to pay back any of the balance owed to Springbok in the time allotted (he continues to owe 100% of the loan to this day).  Thus, Springbok is entitled to repayment of the $250,000 loaned to Simon.

As to interest and placement fee, Springbok claims entitlement to both in addition to the $250,000 loan principal, adding up to a grand total of $306,382.61.  For the following reasons, the Court finds that there was no meeting of the minds in April 2005 with regard to the interest and a placement fee.   For example, the letter dated  April 25, 2005 does not mention anything about a placement fee or interest; nor does the April 22, 2005 precursor letter to that final contract document.  The Court recognizes that in early April, Simon stated that he would pay "the full debt of $250,000 plus interest;" however, there is no further reference to payment of interest or a placement fee at the time of the contract formation (April/May 2005).

The first mention of a placement fee to Andrew or the "Russian" came on September 14, 2005, by way of e-mail from Slowther to Simon.  It  indicates that the money owed to Springbok "does however include the comms [commissions] paid to Andrew and the Russian which has to be refunded by you."[5]   At trial, Slowther testified that he paid Andrew and the Russian $38,958

---

[4]  Simon's letter to broker Steve Hart at Smith Barney authorizing payment out of his First Dallas Associates interest also serves as proof that Simon was aware that there was more than one way to pay back the loan.  It serves to undercut his argument that the disjunctive language of the April 25, 2005 letter indicated that the value of the artwork was the only remaining relief for Springbok.

[5]  This document makes no mention of an interest rate.

(approximately 15%) to have them finance the $250,000 loan (Tr. Trans. 2:25, 1-13). Slowther also testified that the interest rate was five percent initially when the money was "being lent by the Russians," and jumped to 10% when Springbok took over the loan (Tr. Trans. 2:25, 18 through 26, 1).[6] Slowther testified that on January 3, 2006, he e-mailed a spreadsheet to Simon indicating "the amount payable . . . both to Andrew and his Russians and to Springbok Finance." Springbok argues that since Simon did not object, Simon acquiesced to the payments. This allegedly constituted Simon's acknowledgment of the terms of the financing (Tr. Trans. 2:26, 25 through 27, 4). On cross-examination, however, Slowther conceded that "there is no official document" or written instrument to back up the interest costs (Tr. Trans. 2:29, 17-10), and there is no written evidence of the financial arrangements between Springbok and the Russian (Tr. Trans. 2:30, 2-4). Hence, the testimony confirms the lack of documentary proof of a concrete agreement to pay interest and a placement fee in April/May 2005. Springbok is correct, as noted above, that Simon appears to have never made any objections to the amounts as stated, including interest and placement fees, even after discussions with his lawyer; however, the Court must look to the agreement at the time it was made and what the parties had a "meeting of the minds" about at that time, not sometime in the future. *Wilson v. Detella*, No. 97 C 7833, 2005 U.S. Dist. LEXIS 17546, at *15 (N.D. Ill. Aug. 18, 2005) ("Whether a meeting of the minds occurred is judged at the time of the alleged agreement, not weeks or months later."). The Court concludes that no agreement was made as to an interest rate or a placement fee at that time. Therefore, Springbok is not entitled to either.

Also, with regard to Plaintiff's argument that Simon acquiesced to the payment of interest and fees by not objecting to the September 28, 2005 letter, the Plaintiff has the burden to prove that

[6] Thus, there are varying interest calculations.

the fees and interest were due by a preponderance of the evidence. *Totoro, Duffy, Cannova and Co., LLC v. Lane, Middleton and Co., LLC*, 191 N.J. 1, 15 (2007)**.** There is insufficient proof that Simon agreed to payment of such fees and interest at the time the loan was paid. Since the loan was for a relatively short period (one year), and there was an embryonic business relationship being cultivated, it is just as likely Plaintiff waived such costs at the time of making as a matter of good will. Secondly, Slowther, being an expert in finance, albeit in a different type of transaction, had to know the rudiments of a simple real estate transaction such as this.  Setting forth the rate of interest and perfecting a security interest are basic steps.  Under the circumstances, there is no way to reasonably infer that payment of interest and a placement fee are due.

II.

Simon alleges that Springbok agreed to pay him $15,000 per month (the Monthly Payment). Simon relies on the December 2004 Cash Flow Spreadsheet (Op. at p. 4) and the Sharpin Letter (Op. at 5), to support his argument.  Other than these documents, there is little, if any, testimony regarding precisely where or when any such arrangement had been negotiated.  There is no mention of it at the time of establishment of the credit facility. There are no contemporaneous notes made by Simon or Slowther of this understanding, and Slowther paid varying amounts over the course of the business. Upon closer examination of the two documents, neither supports Simon's position.

With regard to the Sharpin Letter, the writing confirms the obligation to pay salaries including Simon's, but it clearly conditions them on sufficient cash flow from sales. The letter states in part:

> We shall pay the invoice [referring to salaries] immediately, subject
> to receiving sufficient proceeds from successfully completed sales of

16

> goods. In the event there are not sufficient funds available, payment
> will be made as soon as possible thereafter.

In this case, the undisputed testimony is that the venture lacked sufficient sales to sustain the business.   The language of the letter, when read fairly and sensibly, means that payments such as the Monthly Payment would be made when funds were available.

Simon ignores the plain language of the Sharpin Letter, and his testimony was not credible. At trial, Simon answered as follows:

> Q: So did you understand at that time, March 1, 2005, that this
> document says that salaries would be paid, "subject to receiving
> sufficient proceeds from successfully completed sales of goods."
>
> A: No, I didn't understand our agreement to be that, no sir.

Simon further avoided answering a question regarding whether he had objected to the terms of this letter.  Instead, Simon made much of the last sentence in the letter. He construed the last sentence concerning the availability of funds to mean payment will be always made as soon as possible thereafter.  As such, he appears to interpret this sentence as an unconditional guarantee of a $15,000 monthly payment (Tr. Trans. 1:77, 10-14) regardless of whether there were sufficient funds available (Tr. Trans. 1:79 5-15).  This is a tortured construction of the Sharpin Letter.  The Court interprets this letter to comport with its plain, unambiguous language – that moneys, including any salaries, would only be paid subject to receipt of sufficient proceeds from successful sales, and that if funds were needed at the time, but were unavailable because of a lack of proceeds, Limited would attempt to make a payment as soon as possible given the amount of money on hand.  *New Jersey v. Gloucester Envtl. Mgmt. Servs.*, No. 92-3860, 2006 U.S. Dist. LEXIS 40999, at *11 (D.N.J. June 21,

2006) ("Under New Jersey law, when the language of a contract is plain, unambiguous, and susceptible to only one interpretation, the words contained therein will be given their 'plain and ordinary meaning.'").  Simon's interpretation of this letter is unreasonable.  Simon is an experienced business person.  Any savvy businessman would have recognized that payment was contingent on sufficient cash flows by virtue of the language of the Sharpin Letter.  Simon's testimony on this point was not credible.

In addition, the December 14, 2004 Cash Flow Spreadsheet likewise does not constitute a binding agreement by Slowther to pay the Monthly Payment.  A fair reading of same is that it represents a projection, not a firm promise to pay.  There is no assurance that the alleged Monthly Payment will be regularly paid. Simon's testimony on this matter is inconsistent.  For example, Simon would not concede that the $15,000 was salary. He testified:

> Q:   Is that money that your attorney had earlier indicated was received by you in the bank account, was that money received by you as salary?
>
> A:   That money was received to be used for my personal life so that I could go to work.  You can call it salary, you could call it expenses covering actual performance.
>
> Q:   So, you call it pretty much whatever you want to call it?
>
> A:   It was income.
>
> Q:   It was income.  Did you receive a W-4 for that?
>
> A:   No, sir.
>
> Q:   Did you receive a 1099?
>
> A:   No, sir.
>
> Q:   Did you file an income tax return for 2004?

18

A:   Yes, sir.

Q:    And did you report any portion of any money received from Tradefin or Springbok as salary?

A:    I really don't recall right now 2004, however, I do believe the accountants that prepared it had all of my documentation at the time. . . .

Q:   The $15,000 was supposed to be salary.  Correct?

A:    It was money to be paid to be monthly to cover my expenses.

Q:   And your expenses included the office expenses for PRC Group?

A:    My expenses were living expenses and business expenses at the time, yes.

In addition, there was debate during trial as to whether the Cash Flow Spreadsheet constituted a concrete agreement to pay salary, or if it was merely a document setting forth projections for financial figures for the coming year.  Simon initially testified that he did not understand the document to set forth business projections, but rather, that it constituted a salary agreement (Tr. Trans. 1:65, 21 through 66:3); then he testified that the document contained a record of a sale that had occurred (Tr. Trans. 1:69, 5-16); then, when asked about that sale, he indicated that the sale had fallen through and that the value of the sale was, indeed, a projection (Tr. Trans. 1:69, 17-25). Simon further testified that "the projections were a joint venture determined by what we believed the eventual business for a 12 month period would be." (Tr. Trans. 1:70, 1-4).  With regard to other recorded sales activity, Simon further testified that the document contained a record of another actual order of garments "with anticipation of re-order over a period of time," but at the same time denied that the document could have contained both projections and records of actual sales (Tr. Trans. 1:71,

1-20).  As a result of this conflict and ambiguous testimony, the Court finds it difficult to believe that the Cash Flow Spreadsheet forms the basis for a contract.  Simon's testimony with regard to the document was confusing, contradictory, and unreliable (Tr. Trans. 1:65 through 1:75).  "It is well within the discretion of the District Court as the trier of fact to assess the credibility of witnesses and to accept or reject their testimony accordingly."  *Harrod v. Cox*, 165 Fed. Appx. 988, 991 (3d Cir. 2006).  The Court found Simon to lack credibility as a witness, and thus rejects his testimony in this regard.

Furthermore, the evidence of payments to Simon were in varying amounts at sporadic intervals.  From a review of Slowther's payment history; it can not be inferred that he agreed to incur the Monthly Payment.  Simon agreed that the portion of the Cash Flow Spreadsheet that indicated salary numbers was  "the plan for the following year" and that the "expenses were the plan based upon those revenues according to the columns listed at the bottom of the page."  (Tr. Trans. 1:73, 7-16).  When asked whether he understood this to mean that the salaries "are being projected to off-set against the proposed revenue" of PRC Group, Simon evaded the question, noting only that he understood the expenses to be paid by Slowther "as his part of the agreement."  Simon was again evasive and lacking in credibility.   The Court thus finds Slowther to be a more credible witness, and he testified that he "never agreed to pay Mr. Richard Simon $15,000 a month" and that the Cash Flow Spreadsheet "was like a business plan that companies present and it shows the perfect picture. I agreed to pay the other heads of the company salaries . . . .  Mr. Simon and myself were supposed to earn $15,000 when we have profitable deals."  (Tr. Trans. 2:43, 6-13).  Further, in colloquy with the Court, Slowther testified as follows:

| | |
|---|---|
| THE WITNESS: | I never made the 15,000 [dollar payments].  Sometimes it would be 3,000.  He would be getting a draw on a profitable deal.[7] |
| THE COURT: | It was a draw against a future deal for profits? |
| THE WITNESS: | Deals that were supposedly on the books and making profits. |
| THE COURT: | But there were none of those? |
| THE WITNESS: | Unfortunately I learned an expensive lesson. |

(Tr. Trans. 2:43, 16-25).

Thus, the Court finds that Cash Flow Spreadsheet did not constitute an agreement to pay Simon the Monthly Payment.

The Court finds that no agreement was reached with regard to the Monthly Payment as claimed by Simon.  Thus, Simon is not entitled to any setoff to the $250,000 he owes Springbok.

### III.

Plaintiff's complaint also state causes of action for unjust enrichment (Count II), fraudulent inducement (Count III), quantum meruit (Count IV), and specific performance (Count V).

With regard to Count II:  "A claim under the quasi-contractual theory of unjust enrichment has only two essential elements: '(1) that the Defendant has received a benefit from the Plaintiff, and

---

[7]  In one of Defendant's trial exhibits, Simon attempts to set forth a chart of his "analysis of claims" showing dates running from September 17, 2004 through May 30, 2006; this document shows the actual amounts paid to Simon by Springbok and the amount that "should have been paid" (i.e., $15,000).  This document indicates that in all but eight months, Simon received some sort of payment.  The payments never totaled exactly $15,000; there were two occasions when the payments were $14,980.00.  This chart corroborates Slowther's testimony that Simon was, indeed, paid something most months, and that no "magic number" was contemplated.  It also appears that the large fluctuations in payments likely had to do with the nature of the business in a particular month, given that payments were to be made out of sale profits – of which there were few, if any.  It is unclear, however, whether the payments listed were "expenses," or "salary," or a combination of both.

(2) that the retention of the benefit by the Defendant is inequitable.' *Wanaque Borough Sewerage Auth. v. West Milford*, 144 N.J. 564, 575, 677 A.2d 747 (1996) (internal citations omitted). 'The unjust enrichment doctrine requires that Plaintiff show that it expected remuneration from the Defendant at the time it performed or conferred a benefit on Defendant and that the failure of remuneration enriched Defendant beyond it contractual rights.' VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994) (citation omitted)." *Garden State Equities, Inc. v. Ross*, No. 05-0085, 2006 U.S. Dist. LEXIS 27464, at *31-32 (D.N.J. Mar. 30, 2006).  Because unjust enrichment is a theory based on quasi-contract, the Court need not address the theory on the merits. The Court has determined that there exists an actual contract in this matter, and thus a quasi-contractual theory is unnecessary.

Plaintiff's fraudulent inducement claim is also without merit.  "To sustain a cause of action for fraudulent misrepresentation under New Jersey law, the following elements must be proven: (1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; (4) reliance on the misrepresentation, and (5) damage to the party who relied on the misrepresentation. The elements are the same for a claim for fraudulent inducement." *Corestar Int'l PTE. Ltd. v. LPB Communs., Inc.*, 513 F. Supp. 2d 107, 125 (D.N.J. 2007) (internal citations omitted).  "Fraud requires clear and convincing proof." *McConkey v. AON Corp.*, 354 N.J. Super. 25, 45-46 (App. Div. 2002).  The Court finds that Plaintiff has not offered clear and convincing evidence that Simon had "knowledge of [the] falsity" of his representation of the value of the First Dallas Associates interest.  Furthermore, Plaintiff has not proved by clear and convincing evidence that it relied upon this alleged misrepresentation.  As noted above, the First Dallas Associates interest

was only cited as the initial security for the loan.  The main contract document – the April 25, 2005 letter  –  makes no mention of the First Dallas Associates interest, and it appears that the ultimate security relied upon by Springbok was Simon's house, the equity therein, and certain artwork as indicated in the letter.  Thus, there is no clear and convincing proof of reliance on Simon's representations regarding the First Dallas Associates interest, and therefore the fraudulent inducement claim fails.

As to the quantum meruit claim, the Court finds as follows.  "To recover under a theory of quantum meruit, a Plaintiff must establish: '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'"  *Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002) (citations omitted).  This theory is moot because the effect of granting Springbok relief under a quantum meruit theory would be the same as granting it relief under a breach of contract theory.  Because the Court is granting relief under a breach of contract theory, the determination of the value of services rendered is unnecessary.

Finally, with regard to specific performance, the Court finds as follows.  Under New Jersey law, "specific performance is appropriate if it will 'do more perfect and complete justice.'" *Ciba-Geigy Corp. v. Liberty Mut. Ins. Co.* (In re Envtl. Ins. Declaratory Judgement Actions), 149 N.J. 278, 294 (1997).  The New Jersey Chancery Court has held:

> Specific performance is a discretionary remedy. In taking jurisdiction in specific performance, a court of equity has within its discretion the granting or the denying of the remedy depending upon elements, conditions and incidents which it regards as essential to the determination of its peculiar mode of relief. In Migel v. Bachofen, 96 N.J. Eq. 608, 611, 126 A. 396, Chief-Justice Gummere said: "The remedy by specific performance is discretionary; the question is not what the court must do, but what, in view of all the circumstances of

23

> the case in judgment, should it do to further justice, and, where the
> enforcement of the contract will be attended with great hardship or
> manifest injustice to the defendant, the court should always refuse its
> aid. Plummer v. Keppler, 26 N.J. Eq. 481, and cases cited; Blake v.
> Flaharty, 44 N.J. Eq. 229, 14 A. 128."

*Fid. Chem. Prods. Corp. v. Rubino*, 142 N.J. Eq. 571, 573 (Ch. 1948) *reversed on other grounds*,

1 N.J. Super. 184 (App. Div. 1949).

Plaintiff seeks an order compelling Simon to sell his home or to obtain a home equity loan

in order to repay the loan. The Court has determined that Springbok is entitled to $250,000 (plus

post-judgment interest) and no more. The Plaintiff may utilize ordinary post judgment measures to

satisfy the amount owed.

## IV.

The Court has already denied Simon's breach of contract counterclaim, finding that

Springbok does not owe him any money in allegedly unpaid Monthly Payments. The only remaining

counterclaim is one for unjust enrichment. Simon could utilize this quasi-contract theory because

the Court has found no contract exists. However, unjust enrichment does not apply here for several

reasons. First, Simon lacked credibility regarding his version of the Monthly Payment. Second,

Slowther did not make any money on the venture; hence, he did not retain any benefit. And third,

Slowther appears to have acted in good faith in making payments to Simon as cash flow permitted.

Therefore, the equitable remedy is not warranted here. *Garden State Equities, Inc. v. Ross*, No. 05-

0085, 2006 U.S. Dist. LEXIS 27464, at *31-32 (D.N.J. Mar. 30, 2006).

## V.

For the reasons set forth above, the Court finds in favor of Plaintiff Springbok on its breach

of contract claim, but only compels payment of $250,000 by Simon (plus post-judgment interest).

24

The only clear agreement in this case is as to the $250,000 loan principal; the agreements do not meet muster as to the interest and placement fee. The Court further finds that Simon has not proved the existence of an agreement on the Monthly Payments, and thus there is no offset to the $250,000 owed by Simon; as such, his breach of contract counterclaim is denied. Both parties took risks in entering these contracts, and as sophisticated and seasoned businessmen, should have drafted much clearer and more precise agreements in light of the circumstances. The Court further denies the remaining counts of Springbok's complaint and denies Simon's counterclaim for unjust enrichment for the reasons set forth above.

_s/Peter G. Sheridan_
PETER G. SHERIDAN, U.S.D.J.

July 28, 2008

25